### 18622.   SOUTHERN GRAVURE CORPORATION v. CLEVELAND, CINCINNATI, CHICAGO & ST. LOUIS RAILROAD COMPANY.

1. The question as to the statute of limitations will not be considered, for the reason that it was not raised in the trial court.
2. The ground of the motion for a new trial based upon newly discovered evidence is without merit.
3. The evidence was in conflict as to the proper classification of the interstate shipment, and for this reason alone it was error for the court to direct a verdict.

DECIDED MARCH 7, 1928.

Complaint; from city court of Atlanta—Judge Dorsey.   November 16, 1927.

*Watkins, Asbill & Watkins,* for plaintiff in error.

*Little, Powell, Smith & Goldstein,* contra.

LUKE, J.   An action brought by Cleveland, Cincinnati, Chicago & St. Louis Railroad Company against Southern Gravure Corporation, for the recovery of alleged unpaid freight charges, resulted in the direction of a verdict for the railroad company.   Its motion for a new trial was overruled, and the defendant excepted.

The following facts are agreed upon:  On June 7, 1922, the plaintiff in error delivered to the Central of Georgia Railway Com-

---

Appeal and Error, 3 C. J. p. 709, n. 61.
New Trial, 29 Cyc. p. 899, n. 56.
Trial, 38 Cyc. p. 1568, n. 98.

pany a carload of tablet covers, consigned to Elam Paper Company, of Marion, Indiana.  Upon receipt of the shipment by the railroad company it issued a bill of lading, a copy of which it attached to the brief of evidence.  The tablet covers were the property of the consignee at the time the bill of lading was issued, but the railroad company had no knowledge of the ownership of the same at that time, other than as derived from the bill of lading.  The said shipment, conveyed over the lines of the initial carrier and of the defendant in error, was delivered by the latter to the consignee at Marion, Indiana, on or about June 20, 1922.  The consignee paid the defendant in error $276.50, the full amount of freight charges then demanded.  On July 19, 1922, the defendant in error discovered the alleged undercharge on the shipment, and demanded payment from Elam Paper Company.  A controversy arose as to the correct legal freight rate covering the shipment, and letters were exchanged between the Elam Paper Company and the defendant in error, and between the defendant in error and the Southern Classification Bureau, in an effort to discover the correct charges due on the shipment.  In June, 1924, Elam Paper Company went into the hands of a receiver.  Up to that time that company could have responded to a judgment for the freight charges claimed.  The defendant in error filed its claim for the alleged undercharge with the receiver of said company, and on April 22, 1925, collected the last payment on the total dividend of $120.64 paid by the receiver.  This amount was all that could ever possibly be collected from that source.  In 1925 the defendant in error made demand upon the plaintiff in error for the difference between the alleged legal rate and the amount originally collected from the consignee, plus said dividend. This demand was refused.

The copy of the original bill of lading attached to the brief of evidence is headed, "Straight bill of lading—original."  In it the Central of Georgia Railway Company acknowledges receipt from Southern Gravure Corporation, at Atlanta, Ga., on June 7, 1922, of "1 car tablet covers, as printed matter N. O. I. B. N.," "weight 3500, class or rate 160."  The shipment is consigned to Elam Paper Company, Marion, Indiana.  On the face of the bill of lading the following clause occurs:  "It is mutually agreed, as to each carrier of all or any of said property, over all or any por-

tion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions, whether printed or written, herein contained (including conditions on back hereof) and which are agreed to by the shipper and accepted by himself and his assigns." The following also occurs on the face of the bill of lading: "If charges are to be prepaid, write or stamp here, 'To be prepaid.'" Nothing is written or stamped in the blank below that clause. This clause also appears: "Received $——— to apply in prepayment of the charges on the property described herein." This clause is neither filled in nor signed. On the back of the bill of lading the following is printed: "The owner or consignee shall pay the freight, and average, if any, and all other lawful charges accruing on said property, and, if required, shall pay the same before delivery." The following appears on the face of the bill of lading: "Hold for inspection (6) Southern W. I. Bureau. Changed by inspection at Atlanta, Ga. Agent will correct billing 560. Rated to river." A witness sworn for the plaintiff in error testified as follows: "I have examined the original bill of lading covering the shipment. At the time this shipment was tendered the Central of Georgia Railway Company in Atlanta by the shipper, it was described as "one car of tablet covers." After the bill of lading had been receipted by the railroad company, this shipment was inspected by Markey's association, and it stamped on the bill of lading, 'Hold for inspection,' and they set the shipment up to printed matter, N. O. I. B. N., and rated the shipment . . first-class rate, and inserted in the bill of lading in red ink $1.60 per 100 pounds rated to the river. It further states by rubber stamp, 'Southern Weighing & Inspection Bureau, Changed by inspector in Atlanta, and agent will correct billing.'"

The tablet cover in evidence is approximately eleven inches long by six inches wide, is made of extra heavy paper, and has on the front of it the picture of a hunter of the old type and two children. The background is made up of several mountains and a most remarkable sunrise. At the top of the cover, in large printed letters, appear the words "Pathfinder;" and under this word, in smaller letters the words, "School Series," are printed. Near the bottom of the cover appear the words "Southern School-Book

Depository." At three different places on the cover, in very small letters, the words, "20th Century Pathfinder" occur. It appears from Consolidated Freight Classification that "printed matter, paper or paperboard, N. O. I. B. N., prepaid," takes a first-class rate; while on "paper articles, pads, tablets or blank-books, not printed, without covers, or plain or printed flexible paper or pulp-board covers," the rate is fifth class.

Mr. Markey, manager of the Southern Weighing and Inspection Bureau, of Atlanta, and an employee of the railroads, testified that tablet covers should be classified as "printed matter N. O. I. B. N.," the abbreviations meaning, not otherwise indexed by name. Mr. Voorhees testified likewise. He further swore that he was a member of Southern Classification Committee, a committee representing all the southern railroads, and that the question as to the proper classification of tablet covers had been before the Consolidated Classification Committee, consisting of Southern Classification Committee, the Official Classification Committee in the east, and the Western Classification Committee, and the unanimous opinion of all the committees was that tablet covers are ratable as "printed matter N. O. I. B. N." He also testified that said committees had considered all angles of the question, and considered whether it was desirable to provide a specific entry in the classification for tablet covers, and that the conclusion of the Consolidated Classification Committee was that the entry "printed matter N. O. I. B. N." was sufficiently definite, and that a more specific entry was not necessary.

Mr. Moore, sworn for the plaintiff in error, testified: that he was traffic manager for the Atlanta Freight Bureau; that he was familiar with rates, and with the issue involved in the case; that the Southern Classification Committee does not provide any specific rating for tablet covers; that the proper classification governs the rate; that Rule 17 of the Consolidated Classification reads: "When articles not specifically provided for, nor embraced in the classification as articles "N. O. I. B. N.," are offered for transportation, carriers will apply the classification provided for articles which, in their judgment, are analogous; in such cases agents must report the facts to the proper officer of the Freight Department in order that the rating applied must be verified and the necessary classification provided;" that the tablet itself

is most analogous to the tablet cover; that tablets carried a rate of 79 cents per 100 pounds; that this rate should have been applied to the shipment of tablet covers; that, so applying it, the charges due on said shipment were $276.50, the amount first charged and collected; and that in his opinion this amount was the total charges due on the shipment.

Mr. Gray, manager of the Southern Gravure Corporation, testified: that the bill of lading under which the shipment was made was prepared by his secretary; that the shipper neither prepaid nor guaranteed the freight charges on the shipment, that it was not requested to do either by the initial carrier; that the tablet covers were sold f. o. b. Atlanta; that the shipment consisted of "glazed paper, 120 pounds table stock;" that the shipper was not advised that the rating on the shipment had been changed until about two and a half years later; that plaintiff in error was first requested to pay freight charges on said shipment in February, 1925, after Elam Paper Company had taken bankruptcy; and that the final payment on the purchase-price of said tablet covers was made in November, 1922.

After a careful consideration of the evidence in the case we have reached the conclusion that it was in conflict as to what was the proper classification of the tablet covers. This being true, it was improper to direct a verdict. But the carrier and the shipper had the right to contract whether the latter or the consignee should pay the freight charges, subject to the rule which prohibits discrimination. L. & N. R. Co. v. Central Iron & Coal Co., 265 U. S. 59 (44 Sup. Ct. 441, 68 L. ed. 900). It is agreed that at the time the shipment moved there were in effect Rules Nos. 1, 9, and 17 of Consolidated Freight Classification No. 2 Section 1(a) of Rule 1 reads: "Unless otherwise provided, when property is transported subject to the provisions of the Official Classification, the Southern Classification, and the Western Classification, or either of them, the acceptance and use are required, respectively, of the 'Uniform Domestic Bill of Lading,' 'Straight,' or 'Order,' or the 'Uniform Export Bill of Lading,' 'Straight,' or 'Order.'" Section 1(c) of Rule 1 reads: "Unless otherwise provided in this classification, property will be carried at the reduced rate specified if shipped subject to all the terms and conditions of the Uniform Domestic Bill of Lad-

ing, or the Uniform Export Bill of Lading, as the case may be. If consignor elects not to accept all the terms and conditions of the Uniform Domestic Bill of Lading or the Uniform Export Bill of Lading, as the case may be, he should notify the agent of the forwarding carrier at the time his property is forwarded for shipment. If he does not give such notice, it will be understood that he desires his property carried subject to the terms and conditions of the Uniform Domestic Bill of Lading or the Uniform Export Bill of Lading, as the case may be, in order to secure the reduced rate."

Applying the foregoing rules to the shipment in question, it had to be moved subject to the provisions of the uniform domestic bill of lading, unless the consignor desired to pay a higher freight rate and have it transported at a greater liability on the part of the carriers. The evidence is that the shipper requested the initial carrier to give it the rate on tablet covers, and that the bill of lading was then made out by the shipper and delivered to the carrier. The "common-law liability," or higher rate, connoting greater liability on the part of the carriers, was not asked for by the shipper, and the bill of lading does not contain any statement that such rate was desired. No such rate was either charged or sought to be collected. We do not think that the notice required by the rule was given by the filling out and delivery to the carrier of the said bill of lading, or in any other way. Under the evidence the shipment was controlled by the terms and conditions of the uniform domestic bill of lading. On the back of said bill of lading appears the following: "Sec. 7. The owner or consignee shall pay the freight and overage, if any, and all other lawful charges on said property; but, except in those instances where it may be lawfully authorized to do so, no carrier by railroad shall deliver or relinquish possession at destination of the property covered . . until all tariff rates and charges thereon have been paid. The consignor shall be liable for the freight, . . except that if the consignor stipulates, by signature, in the space provided for that purpose on the face of this bill of lading, that the carrier shall not make delivery without requiring payment of such charges, and the carrier, contrary to such stipulation, shall make delivery without requiring such payment, the consignor shall not be liable for such charges."

The evidence is that the word "prepaid," used as a part of the classification of "printed matter," etc., means that freight belonging to that classification should have the charges prepaid on it. Under Rule 9, consolidated freight classification, "All charges must be prepaid or guaranteed on any shipment which in the judgment of the agent at point of shipment would not at forced sale realize the total amount of charges due at destination." It does not appear that the agent desired or requested that the charges be either prepaid or guaranteed on the shipment. Certainly the fact that the freight was not prepaid would not of itself absolve the shipper from all liability therefor. In cases similar to this one, the view most favorable to the shipper is expressed in the case of L. & N. R. Co. v. Central Iron & Coal Co., supra, as follows: "Ordinarily, the person from whom the goods are received for shipment assumes the obligation to pay the freight charges; and this obligation is ordinarily a primary one. This is true even where the bill of lading contains, as here, a provision imposing liability upon the consignee. For the shipper is presumably the consignor; the transportation ordered by him is presumably on his own behalf; and a promise by him to pay therefor is inferred (that is, implied in fact), as a promise to pay for goods is implied when one orders them from a dealer. But this inference may be rebutted, as in case of other contracts. It may be shown, by the bill of lading or otherwise, that the shipper of the goods was not acting on his own behalf; that this fact was known by the carrier; that the parties intended not only that the consignee should assume an obligation to pay the freight charges, but that the shipper should not assume any liability whatsoever therefor; or that he should assume only a secondary liability." We do not think it appears in the case sub judice, either from the bill of lading or otherwise, "that the shipper should not assume any liability whatsoever" for the payment of the charges. It follows that the shipper is not freed from all liability by reason of any contract to that effect.

But was the shipper freed from all liability for the unpaid freight charges because the carrier elected to hold the consignee alone liable therefor? We think not. "Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the

full amount by a person liable therefor." The above quotation is taken from the case of L. & N. R. Co. v. Central Iron & Coal Co., supra, and has reference to legal freight charges. See also Pittsburgh, C. C. & St. L. R. Co. v. Fink, 250 U. S. 577, (40 Sup. Ct. 27, 63 L. ed. 1151); N. Y. C. & H. R. Co. v. York &c. Co., 256 U. S. 406 (41 Sup. Ct. 509, 65 L. ed. 1016). "A railway company is not estopped to proceed against a consignee to recover the difference between the amount of freight collected and that which should have been collected, merely because of delay in bringing suit, not extending beyond the period prescribed by the statute of limitations, and because during that time the consignor (who by agreement with the consignee was liable for the freight) became insolvent." *Central of Ga. Ry. Co.* v. *Eatonton Lumber Co.,* 14 *Ga. App.* 302 (80 S. E. 725). "A common carrier may collect freight charges on goods either from the consignor or the consignee, unless it has entered into a special contract binding itself to collect the charges from one of them only. And a mere agreement between the shipper and the carrier that the goods should be shipped 'charges collect,' and a memorandum in the bill of lading to this effect, would not constitute such a special contract." *S. A. L. Ry. Co.* v. *Montgomery,* 28 *Ga. App.* 639 (112 S. E. 652). See also *W. & A. R. Co.* v. *Legg,* 32 *Ga. App.* 368 (123 S. E. 31); *So. Ry. Co.* v. *So. Cotton Oil Co.,* 19 *Ga. App.* 453 (91 S. E. 856), s. c. 147 *Ga.* 646 (95 S. E. 251).

The question as to the statute of limitations not having been raised during the trial of the case, this court can not consider it.

The foregoing substantially covers the original motion for a new trial, as well as the amendment to the motion. Except as indicated above, no reversible error is shown.

*Judgment reversed. Broyles, C. J., concurs. Bloodworth, J., absent on account of illness.*